Clarence Allen LACKEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 69144.

Court of Criminal Appeals of Texas, En Banc.

June 14, 1989.

Rehearing Overruled May 29, 1991.

Richard L. Waldroup (court-appointed), Lubbock, for appellant.

Travis S. Ware, Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

June 14, 1989

WHITE, Judge.

Appellant was convicted of capital murder. See V.T.C.A., Penal Code Sec. 19.-03(a)(2). This offense originated in Lubbock County. Venue was changed to Tom Green County where appellant's first trial took place. The conviction was reversed on appeal. *Lackey v. State,* 638 S.W.2d 439 (Tex.Cr.App.1982). On remand the instant cause was tried on a change of venue in Midland County. After the jury made an affirmative finding on both of the two special issues submitted under Art. 37.-071(b)(1) and (2), V.A.C.C.P., the trial court imposed the penalty of death. This case is before us on direct appeal.

Appellant presents eight points of error in this appeal. Through them, he challenges the sufficiency of the evidence to prove that he committed the burglary with the intent to commit aggravated rape, and the sufficiency of the evidence to support an affirmative answer to special issue number two. Article 37.071(b)(2), *supra.* A review of the facts is necessary.

The instant cause is the second trial of appellant for this offense. The appellant's first conviction was reversed and remanded by this Court. *Lackey v. State, supra.* The factual summary in that opinion accurately reflects the facts proven at appel-

lant's second trial. We will rely on that review of the facts.

Diane Kumph was abducted from her Lubbock apartment shortly before dawn on July 31, 1977. Later that day, her partially nude body was discovered beside a dirt road outside of Lubbock, near appellant's house. It appeared Kumph had been raped. She had been severely beaten. Her neck, face, arms, chest, back and legs were covered with bruises. Her throat had been slashed. This caused her death.

A policeman who responded to a neighbor's report testified that it appeared that the front door of Kumph's apartment had been kicked open. There were indications that a violent struggle had occurred in her apartment.

A fingerprint expert testified that a latent fingerprint discovered on a cigarette package found in the victim's bed belonged to appellant. The brand was the same brand as a pack found on appellant at the time of the arrest. Blood found on appellant's boots matched Kumph's blood type. Secretor analysis showed that the individual whose semen was found in Kumph was a secretor and had the same type O blood as did appellant. An expert testified that hairs found on Kumph's body were similar to appellant's and marks found on the door of Kumph's apartment were very similar to the heel print of appellant's boot.

A person living in the adjoining apartment testified that he was awakened in the early morning, went outside, and saw a man matching appellant's physical description driving away in a white pickup. A woman was slumped over in the seat. The truck was missing a hubcap from the right rear wheel. Appellant, at the time of the murder, had use of a white pickup that was missing a hubcap from the right rear wheel. Appellant was identified by an acquaintance as having been in this truck, driving in Lubbock at approximately 5:00 a.m. on the morning of Kumph's abduction.

Another resident of the adjoining apartment testified that she was awakened that morning by loud banging, and screams of 'help me' and 'get off me' coming from Kumph's apartment.

Appellant's roommate, Carrol Johnson, testified that she had been at work all night the night of the murder. When she returned home that morning, about 7:30 a.m., appellant was not home, but there was fresh blood all about the house. Shortly after her return, appellant phoned Johnson and said he was doing some laundry at a laundromat. He arrived at the house a half hour later with a bedspread and sheets he had washed. He burned a throw rug. Later that day, as Johnson and appellant were discussing radio reports of the murder of Kumph and the search for a suspect, appellant admitted to Johnson: 'Baby, I've got to tell you something—I'm the one they're looking for.'

More incriminating evidence was seized in a search of appellant's house and the white truck. Leaves found on Kumph's face were very similar to leaves found in the truck, according to expert testimony. Hair taken from the truck was very similar to Kumph's, according to the expert. Sweepings from appellant's apartment revealed hair that was very similar to Kumph's, according to more expert testimony. Blood found throughout appellant's home matched Kumph's blood type, including that found on a blood soaked mattress. Blood was also found on the porch and on the exterior of appellant's house. That blood matched Kumph's type. Blood was found on a knife located in the house. Blood found on the pickup matched the deceased's type. *Lackey, supra,* 638 S.W.2d at 439–440.

In his first and second points of error, the appellant disputes whether the evidence at trial proved that he committed the burglary of Kumph's apartment with the specific intent to commit aggravated rape. In the first point appellant states that it was error for the trial court to overrule his motion for instructed verdict, which was based on the State's alleged failure to prove his intent to commit aggravated rape. The second point of error states the

evidence was insufficient to prove he committed burglary with the intent to commit aggravated rape. We will group the two points together. If the evidence was sufficient, the trial court was correct in overruling the appellant's motion for an instructed verdict.

The attorney for the State argued against the motion, relying upon the evidence introduced during the State's case in chief. He recounted for the trial court that the victim's apartment door had been kicked open and left ajar, and that the bootprint on the door came from the appellant's boot. The State's attorney discussed how the apartment had not been ransacked and the victim's purse had not been disturbed, implying that the motive for the entry was not to steal or rob. He stated that the victim's bedroom was in disarray, as if there had been a struggle, and that the appellant's fingerprints were found on a cigarette package left behind in the victim's bed. He then talked about the presence of spermatozoa in the acid phosphate test run on the victim, and that it was of the appellant's type. He also mentioned the discovery of foreign hairs found on the body of the victim, one on her mouth and the other in her pubic area; and that the hairs had been identified by experts as similar to the appellant's hair.

The attorney for the appellant countered the arguments of the State by stating that the evidence showed the rape did not occur in the victim's apartment, if there had been a rape. He made the suggestion that a rape did not occur by relying on the absence of trauma in the region of the victim's vagina. The State responded to this last statement by telling the trial court that there did not have to be vaginal trauma for there to have been a rape. The trial court overruled appellant's motion.

There was other evidence at trial, not recounted by the district attorney in his argument on the motion, which reflected on the intent of the appellant when he committed the burglary. One of the residents of the apartment adjoining the victim's apartment recalled the screams from the victim's apartment at the time of the break-in

("Help me" and "Get off me"). Aside from the disarray in the victim's bedroom, there was evidence that there appeared to have been a violent struggle in the apartment, even though nothing was stolen.

The proper standard of review on this question of the sufficiency of the evidence was set out in *Jackson v. Virginia:* that the evidence must be viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 365, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Moreno v. State,* 755 S.W.2d 866 (Tex.Cr.App.1988). In the instant case, we must, after reviewing the evidence as it was already weighted by the jury's verdict, resolve whether any rational trier of fact could have found beyond a reasonable doubt that appellant broke into the victim's apartment with the intent to commit aggravated rape.

The intent to commit rape in a case of burglary may be inferred from the facts of the offense which were adduced and presented at trial. *Prescott v. State,* 610 S.W.2d 760 (Tex.Cr.App.1981); *Ford v. State,* 632 S.W.2d 151 (Tex.Cr.App.1982); *Williams v. State,* 699 S.W.2d 368 (Tex. App. [1st] 1985); and *McGee v. State,* 725 S.W.2d 362 (Tex.App. [14th] 1987). It is especially reasonable to make this inference when there is no evidence adduced at trial which rebuts the inference. *Ortega v. State,* 626 S.W.2d 746 (Tex.Cr.App.1982) and *Prescott, supra.*

The facts of the instant case which were proven by the State at trial showed that appellant savagely broke into the victim's apartment, declined to steal anything there, seized the victim in spite of her screams of protest, beat the victim up and removed her to his own residence, and killed her there with a large blade knife. The physical evidence showed the presence in the victim's vagina of spermatozoa which was tied to the blood type and secretor status of the appellant. Hairs from the appellant were found in the victim's mouth and vaginal

region. This physical evidence implied that appellant forced the victim to submit to sexual intercourse with him during this criminal episode. The appellant, during the guilt stage of his trial, did not offer any evidence to rebut this.

We find from the facts of the instant case that a rational trier of fact could have found beyond a reasonable doubt that appellant had the requisite intent to commit aggravated rape when he broke into the victim's apartment. The trial court properly overruled the appellant's motion for instructed verdict. There was sufficient evidence of appellant's intent. Points of error one and two are overruled.

In his sixth point of error, appellant asserts the evidence was insufficient to support an affirmative finding to special issue number two during the penalty stage of his trial. Appellant argues that the jury erred when it found there was a probability that he would commit criminal acts of violence that constitute a continuing threat to society.

Both the State and appellant introduced evidence at the penalty stage of the trial, though the appellant chose not to testify. The State proved that appellant was first convicted of a felony on September 6, 1973, when he was convicted of burglary and placed on felony probation. The State also showed the jury that appellant was convicted on January 9, 1975, of the felony offense of burglary with intent to commit rape from an incident at the habitation of Ms. Rita Featherston on June 7, 1974. His previous felony probation was revoked on January 9, 1975, based upon the burglary with intent to commit rape charge. Appellant was sentenced to two concurrent five year sentences to be served in the Texas Department of Corrections.

The State also relied on the facts of the crime itself. The appellant in the instant case was a stranger to the victim, who he apparently chose at random when he kicked open the door to her apartment in the pre-dawn hours of July 31, 1977. The offense began there and continued across town in Lubbock to his residence where he ultimately killed the victim. In addition to

the knife wound from ear to ear across her neck, the victim's body bore evidence of trauma from severe beatings. These facts reflect a crime that was not only senseless, but was also an incident of prolonged brutality and repeated violent assaults.

After the commission of the instant offense, appellant dumped the body of the victim on a farmer's property and made a hurried attempt to conceal the evidence of the offense, even going so far as to rush clothes and sheets to the laundry to clean them of blood. This behavior indicates a lack of remorse by the appellant for his actions. It also shows an attempt to destroy evidence of his actions and to evade prosecution.

Appellant then presented his case to the jury at punishment. He first called his mother to the stand to testify. She told the jury that during appellant's childhood, he was physically abused by his father. His father also physically abused his mother during appellant's childhood. Appellant's mother also explained that appellant dropped out of school during the tenth grade.

Appellant also called Dr. Herbert Modlin, a psychiatrist and expert witness, to testify. Dr. Modlin expressed skepticism that a propensity for future acts of violence could be predicted in any case. He explained that he reviewed the records of appellant's prior psychiatric treatment and interviewed the appellant for one hour on two separate occasions.

Dr. Modlin stated that he was not able to resolve the incompatibility between the type of personality which he found in appellant and the actual facts of this crime. Modlin explained that appellant could not recall the facts of the instant offense during their interviews. Modlin attributed this to his conclusion that appellant was drunk to the point of blacking out during the entire episode. Dr. Modlin gave his professional opinion that it was not likely that appellant would commit future acts of violence that constitute a threat to society.

In rebuttal, the State recalled Betty Edge to testify. During the guilt stage of the trial, Edge testified she had been with

appellant until the hours just before dawn on July 31st. She stated that appellant was intoxicated when they left a nightclub at 2:00 a.m. But, she explained that they drank a small amount of alcohol after that. When Edge last saw appellant around 5:00 a.m., she said he was not drunk.

In resolving whether the evidence supports the jury's affirmative answer to the second special issue, we must review that evidence in the light most favorable to that verdict. If any rational trier of fact could have found beyond a reasonable doubt that appellant would probably commit criminal acts that constitute a continuing threat to society, the jury's verdict must stand. *Jackson v. Virginia, supra;* and *Moreno, supra.* The jury's verdict should be reversed only if we find it to be irrational or unsupported by more than a "mere modicum" of evidence. *Moreno, supra.*

We begin by considering the evidence admitted during the guilt stage of the trial. The facts proven during the first stage were properly before the jury at the punishment stage. These facts alone can often be sufficient to support affirmative findings to the special issues in the verdict at the penalty stage of a capital murder trial. *Russell v. State,* 665 S.W.2d 771 (Tex.Cr. App.1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984). *Carter v. State,* 717 S.W.2d 60 (Tex.Cr.App.1986), cert. denied, 484 U.S. 970, 108 S.Ct. 467, 98 L.Ed.2d 407 (1987); *Drew v. State,* 743 S.W.2d 207 (Tex.Cr.App.1987).

We have already reviewed the facts of the instant case. Appellant's actions during the commission of this crime were senseless, savage and cruel. His actions following the murder of the victim show a lack of remorse for the victim and an absence of regret for his actions. Those actions indicate only a desire to evade discovery and protect himself from the consequences of his actions.

At the punishment stage, the State proved appellant had been convicted of felonies before. While it is true that a burglary is not necessarily a crime of violence, and that the State did not prove the facts of the appellant's prior felonies, the record

before the jury was sufficient to indicate a growing propensity for violent behavior by appellant and that he would constitute a continuing threat to society. In 1973, appellant was placed on felony probation for burglary. In 1975, appellant was convicted of burglary with intent to commit rape, for which his probation was revoked. In the summer of 1977 he burglarized the home of this victim with the intent to commit aggravated rape. He then raped and murdered the victim.

Appellant attempted to counter this evidence with the testimony of Dr. Modlin that, in his professional opinion, it was not probable that appellant would commit criminal acts of violence. He was the only mental health professional to testify during the penalty stage. The State did not offer an expert opinion to contradict Dr. Modlin. However, the mere fact that Dr. Modlin was the only expert to testify does not close discussion of this issue in favor of the appellant.

The jury was the trier of fact in the instant case and, as such, the jury was the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Marroquin v. State,* 746 S.W.2d 747 (Tex.Cr.App.1988). The jury can accept or reject any part of a witness' testimony. *Lafoon v. State,* 543 S.W.2d 617 (Tex.Cr.App.1976).

In the instant case, the testimony of Dr. Modlin did not go unchallenged. The State admitted testimony that appellant was not drunk immediately prior to the commission of this offense, as the appellant led Dr. Modlin to believe. As part of that story, appellant told Dr. Modlin he could not recall the facts of the crime. On cross-examination, the following exchange occurred between the attorney for the State and Dr. Modlin:

Q. (State) Would it surprise you to learn that he had memory of it (the crime) before on August 3, 1977?

A. Yes, it would.

Q. That he remembered it in detail?

**A. Yeah.**[1]

Lastly, during argument to the jury, the attorney for the State pointed out that appellant misled Dr. Modlin. Appellant told Modlin that he told his girlfriend, "I wonder if they are looking for me?" Appellant's girlfriend testified that appellant told her on the evening of the murder that, "I'm the one they are looking for."

From their verdict, it is apparent the jury doubted the credibility of the testimony of Dr. Modlin. The record indicates there was a rational and sufficient justification for that doubt.

The record also reveals there was more than a mere modicum of evidence to support the jury's verdict. We find that a rational trier of fact could have found beyond a reasonable doubt appellant would probably commit criminal acts that constitute a continuing threat to society. Point of error six is overruled.

In point of error three, appellant complains of the denial of his request for a special jury instruction at the guilt stage of his trial. The appellant's special requested instruction concerned the burden of proof:

### 1.

The law recognizes three distinct burdens of proof:

Proof by a *preponderance of the evidence* which is defined as that degree of proof that, when taken as a whole, shows that a fact sought to be proved is more probable than not.

Proof by *clear and convincing* evidence which is defined as that degree of proof which will produce in the jury's mind a firm belief as to the truth of the allegation sought to be established. This is an intermediate standard, falling between the preponderance of the evidence standard and the reasonable doubt standard.

Proof *beyond a reasonable doubt* which is defined as that degree of proof that will erase in the mind of the jury the kind of doubt that would make a person

hesitate to act in the conduct of their more serious and important personal affairs.

The trial court refused to place this instruction in its charge to the jury. Instead, the trial court used a more common instruction on the burden of proof:

In all criminal cases the burden of proof is upon the State. The defendant is presumed to be innocent until his guilt is established by legal and competent evidence beyond a reasonable doubt; and if you have a reasonable doubt as to the defendant's guilt, you will acquit him and say by your verdict "not guilty."

Appellant provides us with no authority to support his requested instruction on the burden of proof. Instead, the appellant discusses the view that a jury in a capital murder trial must be narrowly guided during the penalty stage, citing *"Woodson v. North Carolina,* 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and, *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)." Appellant then asserts that a corollary of this rule would "apply to the trial on guilt or innocence as well." No authority was given to support this assertion. Also, appellant failed to explain how his requested instruction, which juxtaposed a definition of the standard of "reasonable doubt" with two other standards of proof, would accomplish his goal of providing extra guidance to a capital jury. Lastly, appellant does not justify or support the definition of "beyond a reasonable doubt" which he included in his requested instruction.

The constitutionally required burden of proof in criminal cases is that the State establish all elements of the offense beyond a reasonable doubt. *Crocker v. State,* 573 S.W.2d 190 (Tex.Cr.App.1978) (on rehearing); and *Hankins v. State,* 646 S.W.2d 191 (Tex.Cr.App.1983). In the instant case, the trial court's instruction on

---

**1.** The trial court would not permit the State to go into any specific details of the appellant's oral confession to the police on August 3, 1977.

The trial court ruled that only the fact that appellant recalled the events of the crime four days afterwards was relevant.

the burden of proof complied with this requirement. The trial court's instruction was not erroneous.

If appellant was attempting, by his requested instruction, to argue that the trial court should have specifically defined the term "reasonable doubt", we reject this argument. The legislature has not defined the term "reasonable doubt". Because the term has not been defined by statute, the term is to be understood in its usual acceptance in common language and need not be defined in the charge to the jury.[2] Art. 3.01, V.A.C.C.P. Appellant has not demonstrated a need to define the term "reasonable doubt". The instruction which he requested would probably confuse a jury in its deliberations more than it would help the jury. Point of error three is overruled.

In point of error four, appellant states the trial court erred when it rejected his requested charge on mitigation. At trial, appellant objected to the trial court's failure to include in its charge to the jury his "special requested charge" which he submitted in writing to the court. That requested charge reads as follows:

You are instructed that during this phase of the trial, you must consider whatever mitigating circumstances the Defendant has been able to show, if any, in order to answer the special issue which will be submitted to you on that matter.

You are instructed that the law recognizes the existence of certain facts or circumstances which, though not justifying or excusing the offense, may properly be considered in determining whether to impose the death sentence. Such circumstances, in fairness and mercy, may be considered by you as extenuating or reducing the degree of moral culpability of the Defendant, so that it may be appropriate to reduce, diminish, or lessen the punishment to be imposed, because of such mitigating circumstances. Such mitigating circumstances given you, as

jurors, the option to recommend against the penalty of death by the answer that you make to the special issue on this matter.

Under our law, you cannot be precluded from considering as a mitigating factor any aspect of a Defendant's character or record or background that the Defendant proffers as a basis for a sentence less than death.

In this case, the Defendant, CLARENCE ALLEN LACKEY, has proffered the following matters as evidence of mitigating facts or circumstances: (1) Voluntary intoxication at the time of the offense, (2) a turbulent relationship with his father, (3) lack of education, (4) and the youthful age of Defendant.

You are instructed to consider such matters for whatever weight you desire to give them, if any, as mitigating circumstances in the present case. After you have considered them, you will answer a Special Issue on this matter. As I have already instructed you, the burden of proof in this phase of the trial still rests upon the State, and never shifts to the Defendant. Each Special Issue, including the Special Issue on mitigating circumstances, must be proved by the State beyond a reasonable doubt before you can answer it "Yes." Therefore, before you answer this Special Issue "Yes", all jurors must be convinced by the evidence beyond a reasonable doubt that the answer to such issue should be "Yes."

Appellant, as part of the written instruction, requested that a third special issue be included in the charge:

Having in mind and following these instructions, you will now answer the following special issue:

Do you find from the evidence, beyond a reasonable doubt, that the mitigating circumstances proffered by the Defendant, fail to constitute an adequate basis

2. This Court has made the same ruling in dealing with requests for an instruction to define the terms "continuing threat to society" and "criminal act of violence" in the jury instructions at the penalty stage of a capital murder trial. *King v. State,* 553 S.W.2d 105 (Tex.Cr. App.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1284, 55 L.Ed.2d 793 (1978). See point of error eight.

for reducing the punishment of the Defendant from death to a lesser punishment?

If you unanimously find from the evidence, beyond a reasonable doubt, that the mitigating circumstances proffered by the Defendant fail to constitute an adequate basis for reducing the punishment of the Defendant from death to a lesser punishment, you will answer this question "Yes."

However, if ten (10) or more of you agree that a reasonable doubt exists as to whether the mitigating circumstances proffered by the Defendant fail to constitute an adequate basis for reducing the punishment of the Defendant from death to a lesser punishment, you will answer this question "No."

ANSWER: _____

If you have answered the above issue "No," and the vote is less than unanimous, and in that event only, the jurors voting "No" must sign their names below:

After overruling appellant's objections, the trial court gave its charge to the jury. In that charge, the trial court instructed the jury on the evidence before it at the penalty stage as follows:

You are further instructed that in determining each of these Special Issues you may take into consideration all of the evidence submitted to you in the full trial of this case, that is, all of the evidence submitted to you in the first part of this case wherein you were called upon to determine the guilt or innocence of the defendant, and all of the evidence, if any, admitted before you in the second part of the trial wherein you were called upon to determine the answers to Special Issues hereby submitted to you.

The trial court gave the jury the special issues set out in Art. 37.071(b)(1) and (2), V.A.C.C.P.

Appellant argues that his requested instruction and special issue should have been given to the jury as a part of the trial court's charge. Relying on *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), he states that a capital sentencing statute could not preclude the consideration of mitigating evidence. He then asserts that the need for carefully detailed instructions for consideration of penalty stage evidence has been repeatedly voiced in cases emanating from the middle and northern federal districts of Georgia.[3] However, these Circuit Court decisions are not controlling in the appellate courts of this State.

If the appellant implies by this argument that Art. 37.071 is unconstitutional because it does not provide a carefully detailed instruction on consideration of mitigating evidence such as the one he offered at trial, and because the absence of such an instruction precludes the consideration of mitigating evidence, we note that this argument has been resolved adversely to appellant. Recently, the Supreme Court stated:

It is the established Texas practice to permit jury consideration of "whatever mitigating circumstances the defendant might be able to show" in capital sentencing—a practice which this Court relied upon when it concluded in *Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978), that our decision in that case did not require reversal of our earlier approval of the Texas Special Issue scheme in *Jurek* [*v. State*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976)]. *Lockett v. Ohio, supra*, [438 U.S.] at 606–607 [98 S.Ct. at 2965–2966] (opinion on Burger, C.J.). In the decade which has followed, the Texas courts have expressed resolute adherence to *Lockett*, declaring that under Texas' capital sentencing procedures the defense is free to ask "the jury ... to consider whatever evidence of mitigating circumstances the defense can bring before it. *Quinones v. State*, 592 S.W.2d 933, 947 (Tex.Cr.App.1980). *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

---

**3.** *Spivey v. Zant*, 661 F.2d 464 (5th Cir.1981) (reh. and reh. en banc denied, 1982); *Chenault v. Stynchcombe*, 581 F.2d 444, 448 (5th Cir. 1978); *Westbrook v. Zant*, 704 F.2d 1487 (11th Cir.1983); *Finney v. Zant*, 709 F.2d 643 (11th Cir.1983).

Contrary to appellant's argument, the Texas statute is constitutional precisely because it does allow for consideration of mitigating evidence.

Simply put, we have previously recognized that the Texas Special Issues adequately "allow the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provide for jury discretion." See *Lowenfield v. Phelps*, 484 U.S. 231, 245, 108 S.Ct. 546, 555, 98 L.Ed.2d 568 (1988). We adhere to this prior conclusion. *Franklin v. Lynaugh, supra* (opinion of White, J.).

Appellant also argues in this point of error that the capricious application of the statute in the instant case was unconstitutional. Appellant states that this Court should require an instruction on mitigating evidence like his because death is a punishment different from all other sanctions. This difference requires additional and more detailed instruction. Even if our statute does not preclude consideration of mitigating evidence, according to appellant, insufficient guidance of the jury in the instant case renders the imposition of the death penalty unconstitutional.

We disagree with appellant's assertion that the law was capriciously applied by the trial court. Appellant freely presented his mitigating evidence at the penalty stage of the trial. The trial court's instruction to the jury provided sufficient guidance for them to conscientiously consider that evidence in the context of the special issues given to them at trial.[4] Point of error four is overruled.

In point of error five appellant states the Texas death penalty statute prohibits the type of individualized consideration of mitigating factors required by the Eighth and Fourteenth Amendments to the United States Constitution. This appears to be somewhat of a repeat of point of error four. Appellant states that "a great deal of evidence which could and should be considered in mitigation would not be relevant to special issue number two." Appellant then, again, relies on *Lockett v. Ohio, supra,* when he asserts that the prohibition of the consideration of mitigating circumstances is unconstitutional. Appellant argues that Art. 37.071, V.A.C.C.P., prevents a capital jury from considering mitigating evidence, and, therefore, violates the Eighth and Fourteenth Amendments to the United States Constitution.

Appellant explains that the unconstitutionality of the statute is evident from repeated instances where the suppression of some mitigating evidence has been upheld. In *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr. App.1978), appellant states this Court upheld the exclusion of evidence because it was not relevant to the Special Issues. Appellant also cites *Duffy v. State*, 567 S.W.2d 197 (Tex.Cr.App.1978); *Demouchette v. State*, 591 S.W.2d 488 (Tex.Cr. App.1979); and *Russell v. State*, 598 S.W.2d 238 (Tex.Cr.App.1980) as being similar to *Hovila*. He claims they demonstrate that exclusion of some mitigating evidence from consideration constitutes a violation of the Eighth and Fourteenth Amendments.

Initially, we note that appellant does not argue, nor does the record show, that any mitigating evidence which he had to offer at trial was excluded. In the instant case the issue of suppression of mitigating evidence at the penalty stage of a capital murder trial is not before this Court.

We also disagree with his argument that Art. 37.071 prevents a jury from considering evidence in mitigation brought forward by the appellant at trial. *Lockett v. Ohio, supra,* 98 S.Ct. at 606–607; and *Franklin v. Lynaugh, supra.* As such, it does not violate the Eighth and Fourteenth Amendments to the Constitution. Appellant's fifth point of error is overruled.

---

4. The opinion in *Franklin v. Lynaugh* reached a similar conclusion:

Because we do not believe that the jury instructions or the Texas Special Issues precluded jury consideration of any relevant mitigating circumstances in this case, or otherwise unconstitutionally limited the jury's discretion here, we reject petitioner's Eighth Amendment challenge to his death sentence. *Franklin v. Lynaugh, supra* (opinion by White, J.).

In his seventh point of error, appellant argues that the Texas death penalty statute provides for a capricious imposition of the death penalty because the probability of future dangerousness is impossible to predict. Appellant states this violates the Eighth and Fourteenth Amendments to the United States Constitution.

In his brief, appellant explains his argument. He refers to Dr. Modlin, who testified at trial that it would be nearly impossible to predict if an individual would commit future crimes of violence. Appellant also relies on the opinions of experts in the fields of psychiatry and psychology who agree with Dr. Modlin. Appellant argues that a jury of laymen, without the training and experience of experts, are not competent to make this determination of future dangerousness. Therefore, appellant states the imposition of the death penalty based upon this determination constitutes a capricious "infliction" of the death penalty and is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

The Supreme Court has previously rejected this argument in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976),

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.... What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced. *Jurek, supra*, 96 S.Ct. at 2957–2958.

This Court, relying on *Jurek*, has also rejected the argument that Art. 37.071, V.A.C.C.P., is unconstitutional because future dangerousness is difficult to predict. *Smith v. State*, 683 S.W.2d 393 (Tex.Cr. App.1984) (reh. denied 1985).

Appellant advances nothing new in his point of error that would justify overturning these precedents. Appellant cites no authority to support this point of error. Point of error number seven is overruled.

In his eighth point of error, appellant claims that the terms in Art. 37.071(b)(2) are unconstitutionally vague. Appellant states that to sentence him to death under this statute constitutes a cruel and unusual punishment as proscribed by the Eighth and Fourteenth Amendments of the United States Constitution. Appellant directly complains of the vagueness of the following four terms: "probability"; "criminal acts of violence"; "continuing threat"; and "society". None of these terms are defined in the Penal Code or the Code of Criminal Procedure.

Appellant attempts to establish that these terms are both confusing for jurors and difficult to apply by relying on past cases where people have expressed their problems in dealing with these terms.[5] However, appellant does not attempt to show that the jury in the instant case expressed any confusion about the four terms. Appellant also does not cite any authority in support of this point of error.

In *Jurek v. Texas, supra*, the Supreme Court rejected the argument that Art. 37.-071(b)(2), V.A.C.C.P., was unconstitutionally vague. In *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977), this Court held that a trial court was not required to specifically define "probability", "criminal acts of violence", and "continuing threat to society" in its charge at the penalty stage of a capital murder trial. These terms are not specifically defined by statute. As a result, they are to be taken and understood in "their usual acceptation in common language." *King, supra*, 553 S.W.2d at 107;

---

5. In *Shippy v. State*, 556 S.W.2d 246 (Tex.Cr. App.1977), a psychiatrist witness was unable to specifically define "probability". In *Muniz v. State*, 573 S.W.2d 792 (Tex.Cr.App.1978), the jury sent out a question requesting a definition of "probability". In *Livingston v. State*, 542 S.W.2d 655 (Tex.Cr.App.1976), a jury sent out a question requesting a definition of "criminal acts of violence".

None of these cases cited by appellant held that Art. 37.071 was unconstitutionally vague.

Art. 3.01, V.A.C.C.P. This decision was cited with approval in *Sanne v. State,* 609 S.W.2d 762, at 775 (Tex.Cr.App.1980), and *DeLuna v. State,* 711 S.W.2d 44 (Tex.Cr. App.1986). Appellant's eighth point of error is overruled.

The judgment of conviction is affirmed.

DUNCAN, J., not participating.

CLINTON, Judge, dissenting.

The majority opinion could find support on one or another theory of review previously espoused by some other majority of the Court. See, e.g., *Burns v. State,* 761 S.W.2d 353 (Tex.Cr.App.1988). But to the extent this majority relies on the explication of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), found in *Moreno v. State,* 755 S.W.2d 866 (Tex. Cr.App.1988), I must dissent, for reasons stated in my concurring opinion there, and in dissent in *Nevarez v. State,* 767 S.W.2d 766 (Tex.Cr.App.1989).

More disturbing, however, is the majority's reliance upon *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), in its resolution of appellant's points of error four and five. The majority seems to find dispositive language from the plurality opinion in *Franklin,* supra, that was not ratified by a majority of justices of the United States Supreme Court.* What a "majority" found in *Franklin* was that the evidence proffered at the punishment phase in that case had no mitigating impact aside from its tendency to support a negative answer to the second special issue. "If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the

special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation. In my view, however, this is not such a case."

487 U.S. at 188, 108 S.Ct. at 2333, 101 L.Ed.2d at 173. (O'Connor, J., Concurring).

Manifestly, appellant in this cause presented evidence in mitigation, Op. at pp. 120–121, which would have no particular relevance to special issues, except inasmuch as it may have the paradoxical tendency to support, rather than undermine, a finding of future dangerousness. See *Stewart v. State,* 686 S.W.2d 118, 125 (Tex. Cr.App.1984) (Clinton, J., dissenting). Thus, like *Penry v. Lynaugh,* 832 F.2d 915 (CA5 1987), *cert. granted,* 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), appellant's *is* a case a majority of the Supreme Court apparently would agree squarely presents the asserted Eighth Amendment issue. It simply cannot be said, in view of the concurring and dissenting opinions in *Franklin,* supra, that appellant's argument "has been resolved adversely to" him by a majority of the United States Supreme Court. See n. *, ante.

The majority notes that it is not appellant's contention that mitigating evidence was excluded. In its recitation of the facts the majority excerpts that portion of the court's charge which authorized the jury to consider *all* the evidence, both at guilt and punishment stages of trial, in answering

---

* Today's majority opinion reproduces two portions of the plurality opinion of *Franklin,* supra, in support of its holding. Op. at p. 119. The first excerpt is merely expository in nature, to explain that in *Franklin,* supra, as in this case, the petitioner did not claim he had been denied the opportunity to *present* mitigating evidence at trial. Writing for the plurality, Justice White had not yet even begun his analysis with respect to the asserted deficiency in the jury charge. The second excerpt is drawn from the latter part of the plurality opinion, wherein it is opined, in

essence, that evidence relevant to negative findings on special issues is all the "mitigation" constitutionally required. This is a view at least three members of the Court expressly rejected, 487 U.S. at 199–200, 108 S.Ct. at 2340, 101 L.Ed.2d at 182 (Stevens, J., dissenting, joined by Brennan and Marshall, JJ.), and about which two others expressed grave "doubts[,]" 487 U.S. at 184–186, 108 S.Ct. at 2332, 101 L.Ed.2d at 172 (O'Connor, J., concurring, joined by Blackmun, J.).

the special issues. The implication seems to be that such an instruction suffices to inform the jury that in that endeavor it may consider appellant's proffered evidence in mitigation. The deficiency in such a charge, it seems obvious to me, is that it does not inform a jury how it may regard evidence which, though it may in a broad sense tend to "moderate blameworthiness," *Stewart v. State*, supra, 686 S.W.2d at 126, nevertheless has no "logical relevance" to the issues in Article 37.071(b). See *Burns v. State*, supra, 761 S.W.2d at 358, n. 5. A majority of the Supreme Court may yet hold that the State can constitutionally limit "mitigation" to only that evidence which *does* in logic tend to negate one of the special issues. I do not expect such a holding; I certainly would not presume it.

In short, I regard today's opinion of the Court as a feint, in anticipation that the Supreme Court will presently deliver the knockout punch. But, at the risk of mixing sports metaphors, I do not think a capital appeal should be treated as a tag team event. Appellant is entitled to a full review of his conviction in this Court. Because he has not received it, I respectfully dissent.

TEAGUE, Judge, dissenting.

I respectfully dissent to this Court's majority opinion's overruling the sixth point of error that is presented on behalf of Clarence Allen Lackey, henceforth appellant, that the evidence is insufficient to support the jury's affirmative finding "[that] there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat of society." See Art. 37.071(b)(2), V.A.C.C.P.

In ruling that the evidence is sufficient, does the majority opinion not owe an explanation to the citizens of Lubbock County why this Court ruled that Jim David Huffman, a former resident of Lubbock County, should not die but now rules that Clarence Allen Lackey, another former resident of Lubbock County, should die, especially given the fact that the facts of this cause are weaker than those found in Huffman's

case that would authorize the State inflicting a premature death?

Contrary to most supreme courts of this Nation, however, this Court does *not* make either a proportionality or comparison review of death sentences, and also does not on its own make an independent review of a particular death sentence. If the issue of the sufficiency of the evidence to sustain the jury's affirmative answer to special issue number 2 is presented to this Court by the defendant, then this Court will review same; otherwise, although it can do so, it is not required to do so, and, according to my research to date, has never done so in the past. See *Banda v. State*, 768 S.W.2d 294 (Tex.Cr.App.1989), fn. 2.

Thus, when the issue *is* raised, this Court resolves the issue on a case-by-case basis. However, cases which this Court has reversed for insufficiency of the evidence, as to the second special issue, should be used for guidance in resolving the issue. See *Kunkle v. State*, 771 S.W.2d 435 (Tex.Cr. App.1986). In this instance, appellant presents the issue, but the majority opinion rejects his contention that the evidence is insufficient to sustain the jury's affirmative answer to the second special issue. In light of what this Court has done in several other cases, in setting aside the jury's affirmative answer to special issue number 2, I disagree.

Just recently in *Burns v. State*, 761 S.W.2d 353 (Tex.Cr.App.1988), this Court reversed the trial court's judgment of conviction and sentence of death because the trial judge refused to admit into evidence certain evidence that was deemed to be "mitigating" evidence. This Court observed the following:

Over the past dozen years this Court has articulated its standard for appellate review of sufficiency of evidence to support an affirmative answer to special issue two in a number of ways. We have consistently said we view the evidence in the light most favorable to the jury's answer, e.g., *Starvaggi v. State*, 593 S.W.2d 323, 325 (Tex.Cr.App.1979) (footnote deleted), without clearly explicating what view of the evidence would *be* the

most favorable in light of the jury's constitutional function to weigh any proffered evidence in mitigation. In other instances, seemingly more mindful of that function, we have held that the evidence was such that 'the jury was justified in finding that the aggravating factors outweighed the mitigating factors[,]' e.g., *Duffy v. State*, 567 S.W.2d 197, 209 (Tex.Cr.App.1978); *Demouchette v. State*, 591 S.W.2d 488, 492 (Tex.Cr.App.1979); thus suggesting 'a more substance review' than had been conducted in other cases. See Dix, Appellate Review of the Decision to Impose Death, 68 Geo.L.J. 97, 151 (1979). As if to disown that notion, however, the Court has at least on one occasion combined these two pronouncements, finding that 'the evidence, viewed in a light most favorable to the verdict, is sufficient for the jury to have found that the mitigating factors introduced by appellant did not outweigh the aggravating factors and that there is a probability that appellant would commit acts of violence that would constitute a continuing threat to society.' *Green v. State*, 682 S.W.2d 271, 289–90 (Tex.Cr.App.1984) (footnote deleted). Recent decisions have abandoned altogether the inquiry whether the evidence would justify a jury finding that aggravating factors outweighed mitigating. Instead, the Court has begun to apply an unadulterated *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard, beginning with *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr.App.1986). A typical articulation of the standard appears in *Harris v. State*, 738 S.W.2d 207, at 225–26 (Tex.Cr. App.1986):

> 'When we view the facts, we must evaluate the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have made the finding beyond a reasonable doubt.'

See also *Alexander v. State*, 740 S.W.2d 749, 761 (Tex.Cr.App.1987). ('... applying the 'rational trier of fact' test....'); *Livingston v. State*, 739 S.W.2d 311, 340 (Tex.Cr.App.1987) ('... whether the evidence ... would lead any rational trier of fact to make the finding ...'). Thus has the Court narrowed its focus on appeal to 'whether a rational trier of facts could have found the elements of Art. 37.-071(b)(2), supra, beyond a reasonable doubt[,]' *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Cr.App.1987), opining that this appellate standard will adequately serve to 'make certain that the death sentence is not 'wantonly or freakishly' imposed[.]' Id., at 63. (footnote deleted). See also *Beltran v. State*, 728 S.W.2d 382, 389–90 (Tex.Cr.App.1987); *Cockrum v. State*, 758 S.W.2d 577 (Tex.Cr.App., 1988). (Pages 355–56 of opinion.)

In footnote 4 of the opinion, the following was also stated:

> Thus, also, have we abandoned any pretense of this Court balancing mitigating and aggravating evidence so as to determine, independently of the jury's verdict, the 'appropriateness' or 'justness' of imposition of the death sentence in a given case. See Dix, supra at 150–51....

In *Burns*, the Court used the general "*Jackson v. Virginia*" standard of review and concluded that the evidence was sufficient to sustain the jury's affirmative answer to special issue number 2.

I personally am not so sure what to make out of the above, given the fact that only four judges of this Court joined the *Burns*, supra, opinion, which was handed down on October 19, 1988, and the fact that five judges of this Court just recently joined all of the opinion of *Lane v. State*, 743 S.W.2d 617 (Tex.Cr.App.1987), in which the majority opinion in that cause, in rejecting the defendant's contention that the evidence was insufficient to sustain the jury's affirmative finding to the second special issue, stated the following, albeit implicitly giving lip service to the general "*Jackson v. Virginia*" standard, see footnote 10, at page 629:

> We balanced the evidence on both sides of this sufficiency question, considering the evidence at both stages of the trial. *Fierro v. State*, 706 S.W.2d 310 (Tex.Cr. App.1986).

On the appellant's side of the issue, he testified that the shooting was accidental as a result of the 'hair trigger' of his firearm. The State's eye-witnesses disputed appellant's version of his actions in shooting the victim. The State's firearm expert proved that appellant's weapon was far too stable to be considered as having a 'hair trigger.'

On the State's side of the case, there was the testimony of the eye-witnesses to the shooting. In addition, there was the testimony of the appellant's cellmate. The cellmate reported the statements made by the appellant in jail. Considering all of the evidence, it reached the level of sufficiency which was described in *Williams v. State*, 674 S.W.2d 315 (Tex. Cr.App.1984), and *Smith v. State*, 540 S.W.2d 693 (Tex.Cr.App.1976) (footnote deleted). We overrule the appellant's fifty-first point of error. (630).

What is puzzling, at least to me, is the fact that Judge White, who authors this majority opinion, also authored the *Lane* majority opinion, but nowhere in this opinion does he mention the balancing test that he used in *Lane*. If one is to be consistent, shouldn't one continue to subscribe to the same test?

Contrary to many jurisdictions whose statutes require the jury to find in the affirmative at least one of several enumerated aggravating circumstances, see, for example, *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), which concerned our neighboring sister State of Louisiana's capital murder statute, Texas does not permit jurors to use the aggravating versus the mitigating circumstances test; it instead uses special issues in deciding the issue whether the defendant should live or die. See Art. 37.071, V.A.C.C.P. Also see *Fearance v. State*, 771 S.W.2d 486 (Tex.Cr.App.1988) (Teague, J., dissenting opinion.)

However, as Judge Clinton pointed out in *Burns*, this Court does not always use the same test in judging the sufficiency of the evidence as it relates to special issue number 2. Has this Court, however, reached the point where not only is the issue to be decided on a case by case basis, but depending on which test the author of the opinion decides to pull from his "cheat sheets" will determine the test that governs the issue in that cause?

This time Judge White has decided to use the following test: "The jury's verdict should be reversed only if we find it to be irrational or unsupported by more than a 'mere modicum' of evidence." (Page 116 of opinion.) But, when it comes to deciding the sufficiency of the evidence as to the jury's affirmative finding on the second special issue, what does this mean? If this means more than nothing, how much more than nothing is enough?

The majority opinion concludes: "We find that a rational trier of fact could have found beyond a reasonable doubt appellant would probably commit criminal acts that constitute a continuing threat to society." (Page 116 of opinion). Apparently, what the majority found was that the evidence was more than no evidence, and that any rational trier of fact could have also answered the second special issue in the affirmative. I am unable, however, to say that if any rational trier of fact carefully considered only the evidence that went to whether there is a probability that appellant would in the future commit criminal acts of violence that would cause him to be a continuing threat to society, he would answer the special issue in the affirmative.

I agree with the majority opinion that the facts of this cause are bad. But isn't that true of every single capital murder case? In *Roney v. State*, 632 S.W.2d 598 (Tex.Cr. App.1982), this Court made it clear, didn't it, that "To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery [or some other designated underlying offense] would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State*, 522 S.W.2d 934; *Ju-*

*rek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [1976]." (Page 603).

Thus, under *Roney,* it was incumbent upon the State, in addition to the facts of the case, to present additional evidence that would warrant this Court sustaining the State's wishes to inflict upon appellant a premature death. So, besides the facts of the case, what else did the State present at the punishment stage of the trial?

In this instance, at the punishment stage of the trial, the State did not introduce any prior criminal convictions that appellant had sustained that were presumptively violent crimes. It did, however, introduce several prior burglary convictions that appellant had sustained. However, without more, these burglary convictions are not prima facie crimes of violence. See *Tew v. State,* 551 S.W.2d 375, 378 (Tex.Cr.App. 1977); *Powell v. State,* 538 S.W.2d 617 (Tex.Cr.App.1976). Cf. *Mendoza v. State,* 460 S.W.2d 145 (Tex.Cr.App.1970); *Waffer v. State,* 460 S.W.2d 147 (Tex.Cr.App.1970); *Wisdom v. State,* 708 S.W.2d 840 (Tex.Cr. App.1986). Of course, a violent act occurs through both intent and the act itself. If one is convicted of a crime such as burglary with the intent to commit rape, he has not technically committed a violent crime. The conviction, standing alone, only represents that he had the intent to commit a violent crime, but does not represent, standing alone, the fact that he committed a violent crime. See *Hamilton v. State,* 676 S.W.2d 120 (Tex.Cr.App.1984), and *Schutz v. State,* 646 S.W.2d 224 (Tex.Cr. App.1983). If one carefully observes, see page 116 of the majority opinion, some sort of effort is made to somehow make the prior burglary convictions crimes of violence by showing that the facts of this cause show that appellant burglarized the residence of the deceased, and thereafter raped and murdered her. Come on Judge White, you can do better than that, can't you?

Other than the prior burglary convictions, the State did not present any other evidence that would go to the second special issue. I pause to emphasize that the State did not at the punishment stage of the trial present any "bad" reputation testimony or evidence. Nor did the State present any "bad" psychiatric or psychological testimony or evidence.

To counter what the State did introduce at the punishment stage of the trial, on the issue of whether there was a probability that appellant would commit criminal acts of violence in the future that would constitute a continuing threat to society, appellant had his mother testify; had a United States Probation Officer testify; had a high school teacher, who also taught the then District Attorney of Lubbock County, testify; and had Dr. Herbert Modlin, a distinguished and well known psychiatrist who is on the staff of the world renowned Menninger Clinic in Topeka, Kansas, testify, whose testimony was neither rebutted nor refuted by the State. Because I find that the mother's testimony, the probation officer's testimony, and the school teacher's testimony amount to little more than "don't kill him" type testimony, I will not discuss their testimony, but will detail Dr. Modlin's testimony.

Dr. Modlin did an in depth study, through personal interviews and the obtaining of psychiatric and psychological records that existed on appellant, which are voluminous, in order to decide whether appellant might in the future commit criminal acts of violence that would cause him to be a continuing threat to society. Dr. Modlin concluded that the crimes that appellant committed on the night in question were completely out of appellant's character in light of his psychological make-up. "It doesn't make any sense at all." Dr. Modlin further concluded that appellant was not paranoid, psychotic, was unable to be clever or dissemble facts, and any problems that appellant had, such as drinking, were curable or treatable ones.

If the purpose of the punishment stage in a capital murder case is to provide a reasonable and controlled decision on whether a defendant should be forced to undergo a premature death, and to guard against its capricious and arbitrary imposition, as this Court held in *Roney,* then what evidence is there in this record, out-

side of the facts of the crime itself, that would warrant any rational trier of fact to conclude that there is a reasonable probability that appellant might in the future commit criminal acts of violence that would cause him to become a continuing threat to society?

Dr. Modlin, a true expert witness, who was not like some psychiatrists this Court is familiar with who profess that they can stand at the end of a football field and tell whether the defendant, who is standing at the other end of the football field, will in the future commit criminal acts of violence and that he will become a continuing threat to society, testified after an in depth study on the issue that what appellant did on the night in question was out of his character, and that appellant probably committed those acts because he had consumed a large quantity of the spirits. Dr. Modlin also testified that appellant is not paranoid or psychotic; that any drinking problem that he might have was curable; and that in his expert opinion appellant would not in the future commit acts of criminal violence that might cause him to become a continuing threat to society, and that the burglary and murder that appellant committed were spur-of-the-moment, spontaneous acts, and were not planned or calculated acts of violence. There is no evidence in the record that in the approximately two hours that consumed the period of time in which appellant committed the offense for which he has been convicted appellant committed any unrelated criminal wrongs. From appellant's school records we learn that although he was not a very good student, he nevertheless made good grades in citizenship, which encompasses adhering to rules and regulations. We are also informed from this record that while attending school appellant did not have any behavioral or attitude problems. The record also indicates that appellant had what might be best described as an unenviable childhood. The record reflects that when appellant committed the offense he was only 23 years of age, a sufficiently early age for rehabilitation. Furthermore, appellant confessed to his girlfriend, thus demonstrating an awakened and repenting conscience.

He also demonstrated remorsefulness for what he did to his victim, the deceased.

If one compares the facts of this cause and the evidence that was presented at the punishment stage of the trial with those cases which this Court has reversed for insufficient evidence on the "probability" question, see, for example, *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988), a Lubbock County case in which this Court held that the evidence was insufficient to sustain the jury's answer to the second special issue, which had facts on both guilt and punishment just as bad, if not worse than those found in this cause; *Roney, Wallace v. State*, 618 S.W.2d 67 (Tex.Cr. App.1981); *Brasfield v. State*, 600 S.W.2d 288 (Tex.Cr.App.1980); *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978); *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1982); *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr. App.1987); and *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987), as well as those cases in which our present and former Governors commuted death sentences to life imprisonment, I believe that he will agree with me that this Court's decision today to sustain the jury's affirmative answer to the second special issue is neither a logical nor a rational one.

I find that the majority opinion's attempts to selectively pluck from Dr. Modlin's testimony what might facially appear to be damaging evidence is an effort without meaning, unless one cares to overlook the totality of Dr. Modlin's testimony. The same is true as to what the majority opinion plucks from appellant's girlfriend's testimony.

Perhaps the citizens of Lubbock County will understand why, given the facts of this cause and the facts of *Huffman*, this Court decided that Jim David Huffman, one of its former residents, should live, but today decides that Clarence Allen Lackey, another former resident, on facts no worse than those found in *Huffman*, must suffer a premature death. I, for one, don't.

Perhaps given the fact that "Studies on the prediction of violence are consistent: clinicians are wrong at least twice as often as they are correct," Faust and Ziskin,

"The Expert Witness in Psychology and Psychiatry", *Science*, July, 1988, it would be proper for the foreman of any death penalty jury, in deciding whether the jury should answer special issue number 2 in the affirmative or negative, to flip a coin, and, if the coin turns up heads, the defendant lives, or, if it turns up tails, he must suffer a premature death. In deciding whether the jury correctly answered special issue number 2, the Presiding Judge of this Court, on behalf of its members, could also flip a coin, and, if the coin turns up tails, the jury's verdict will be set aside, but if the coin turns up heads, the jury's verdict will be affirmed. This would at least comport with the scientific method that the tyrannical Mexican Government under Antonio Lopez de Santa Anna used in deciding which of the 176 Texians of the ill fated Mier Expedition would be executed in February, 1843, in Salado, Mexico. Every tenth man who drew a black bean was executed. Apparently, the Mexican Government was superstitious about rounding off numbers because only 17 Texians were executed. By the jury and this Court using the scientific coin flipping method, we would at least easily know how and why Huffman, one resident of Lubbock County, who is just as bad, if not worse than appellant, another resident of Lubbock County, gets to live, but appellant gets to die a premature death.

I respectfully dissent to overruling appellant's sixth point of error.

MILLER, Judge, dissenting.

In as much as Judge Clinton's dissent continues the belief that jurors in a capital murder case need a special instruction on mitigating evidence, as aptly set out in *Stewart v. State*, 686 S.W.2d 118 (Tex.Cr. App.1984) (Clinton, J. joined by Miller, J.,

1. The murder in the instant cause occurred in Lubbock County. Venue was changed to Tom Green County. Appellant was convicted, but his conviction was reversed on appeal. *Lackey v. State*, 638 S.W.2d 439 (Tex.Cr.App.1982). On remand, the instant cause was tried on a change of venue in Midland County.

Dissenting), I join his dissent to the disposition of point of error number four. We only stopped dissenting to the majority's steadfast refusal to require such an instruction because to continue to do so was "futile". See *Johnson v. State*, 691 S.W.2d 619 (Tex.Cr.App.1984) (Clinton, J. joined by Miller, J., Dissenting).

## OPINION ON APPELLANT'S MOTION FOR REHEARING

### May 29, 1991

CAMPBELL, Judge.

Appeal was taken from a conviction for capital murder. TEX.PENAL CODE § 19.-03(a)(2). After finding appellant guilty, the jury returned affirmative findings to the special issues under TEX.CRIM.PROC. CODE art. 37.071. Punishment was assessed at death.[1]

On direct appeal, in his fourth and fifth points of error, appellant argued that the trial court erred when it refused to give the jury his requested charge on mitigating evidence at the punishment phase of his trial, and that article 37.071 prohibits individualized consideration of mitigating evidence in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

On original submission, we rejected appellant's arguments and affirmed his conviction. In regard to his fourth point of error, we found that the trial court's instruction provided sufficient guidance to the jury to "conscientiously consider" the mitigating evidence "in the context of the special issues." See page 120. We further noted that article 37.071 is not unconstitutional even though it does not provide an instruction on consideration of mitigating evidence beyond the scope of the special issues.[2] In regard to appellant's fifth point

2. In support we cited *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2332, 101 L.Ed.2d 155 (1988):

Simply put, we have previously recognized that the Texas Special Issues adequately "allow the jury to consider the mitigating aspects of the crime and the unique characteristics of the perpetrator, and therefore sufficiently provide for jury discretion." See *Lowenfield v.*

of error, we found that article 37.071 did not prohibit or prevent the jury from considering appellant's mitigating evidence.

In his motion for rehearing, appellant argues that the mitigating evidence admitted during the punishment phase of his trial is similar to the evidence presented in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[3] Appellant argues that in the absence of a charge that instructs the jury to apply the mitigating evidence in answering the special issues of article 37.071, or another special issue dealing specifically with mitigating evidence, the jury is left without a vehicle, required by *Penry*, for expressing a "reasoned moral response" in regard to their decision on punishment. Appellant submits that the jury could not act on the mitigating evidence before them in answering the special issues—thus ensuring a sentence of death.

We granted appellant's motion for rehearing in order to determine whether, in light of the mitigating evidence offered at trial, the trial court erred in rejecting appellant's proffered special instruction at the punishment phase of his trial. We now hold that the mitigating evidence of character and background offered at trial was relevant to special issue two of article 37.071, that the mitigating evidence was not relevant to appellant's "moral culpability" beyond the scope of the special issues of article 37.071, that the trial court did not err in refusing to submit appellant's requested instruction on such evidence to the jury, and that the denial of appellant's requested instruction did not prevent the jury from making an individualized assessment of appellant and a "reasoned moral response" about the appropriateness of the death penalty in the instant case.

## I. MITIGATING EVIDENCE

At trial, the appellant offered evidence of a "disadvantaged background and emotional or mental problems" which he now claims shows "that he might be less culpable than [other] defendants who had no similar excuse." Appellant's Brief on Rehearing, at 5. Furthermore, he claims that the jury could not give effect to such evidence in answering the special issues under the death sentencing procedure of article 37.071.

The record reveals potentially relevant mitigating evidence including: 1) a low level of intelligence, shown by extremely substandard IQ test scores and a very poor school record; 2) a turbulent childhood and troubled relationship with his father; 3) youthful age (23) at the time of the offense; 4) voluntary intoxication and "alcoholic black-out" at the time of the offense; and 5) a pattern of "periodic drinking," with the inability to control his drinking once initiated. Although appellant avers that *Penry* is limited to the facts of that case, he contends that the evidence offered at his trial regarding childhood abuse and school problems is similar to the evidence in *Penry*.

Annabelle Lackey, appellant's mother, testified that appellant was moved around to several cities as a child, that appellant did poorly in school, that appellant's father drank a lot, that his father and he "fussed a lot," and that his father "hit him some." She also testified that appellant did not drink around her, and she did not think that appellant had a drinking problem.

Betty Edge testified that she was with appellant for several hours prior to the murder of Kumpf. Edge testified that at the time of the murder, she had known appellant for almost six months. On the night of July 30, 1977, Edge and friends were at a small club in Lubbock. Appellant arrived around midnight, at which time Edge considered him to be intoxicated. Appellant drank beer at another table until the bar closed at 2 a.m. At that time Edge, appellant, and four other persons continued on to an after hours club, where appellant

---

*Phelps,* 484 U.S. [231, 108 S.Ct. 546, 98 L.Ed.2d 568] (1988). We adhere to this prior conclusion.
*Lackey,* at 120.

**3.** The original opinion in the instant cause was handed down on June 14, 1989. *Penry v. Ly-* *naugh* was decided on June 26. We granted appellant's motion for rehearing on September 13, 1989.

drank at most one more beer. The group stayed there less than an hour. Edge and appellant were invited to the mobile home of their friends. They were at the mobile home for almost an hour, when Edge left to take one of the group home, and appellant left to check on a friend. They ran into each other again outside the after hours club, and returned to the mobile home. Sometime later, appellant removed all of his clothing, and Edge removed most of hers. Edge refused to engage in sex, and appellant told her she was "a lady", and "to go home, and not be going to bars anymore." Appellant did not appear angry and left shortly after 5 a.m.

Edge testified that appellant was still intoxicated around 4 a.m., but appeared to be "sobering up" even though he continued to drink from midnight till after 4 a.m. She testified that she could not tell how many drinks appellant had consumed between midnight and 2 a.m., but that appellant might have had one beer at the after hours bar, and possibly two or three beers after that. Appellant was intoxicated, but at all times coherent and conversational.

Dr. Herbert Modlin, a general psychiatrist, psychoanalyst, and board certified neurologist, testified that he had examined appellant for two hours and had read appellant's past medical psychiatric and psychological reports, and educational records. Modlin testified that appellant had been psychologically tested as an adult, and at ages 7, 11, and 14; that appellant's school record in academics was extremely poor, but that he had good marks for citizenship and art; that appellant's IQ was 75 at age 7, 80 at age 11, 67 at age 14, which was mental retardation, and as an adult was probably in the 70–80 range; and that appellant was "over controlled" and "somewhat inh[i]bited emotionally." In Modlin's opinion, appellant did not fit any particular

category such as psychotic, impulsive paranoid, or anti-social personality.

Modlin, however, classified appellant as a "periodic drinker." Although appellant did not have a daily need for alcohol, "[t]he problem [was] that he often drank too much and it got out of hand, and he would have alcoholic blackouts."[4] Modlin testified that appellant's version of the events on the morning of Kumpf's murder was consistent with an alcoholic blackout at the time of the murder. Modlin testified that appellant recognized his alcohol problems, and that appellant would probably not constitute a continuing threat to society.

The State presented evidence to refute appellant's mitigating evidence and his claim of alcoholic blackout. Carroll Johnson Holmes, appellant's girlfriend and roommate at the time of the murder, testified that when appellant saw the news coverage of Kumpf's murder, he turned to her and said, "Baby, I've got to tell you something. I'm the one they're looking for." The State also introduced appellant's prior conviction for burglary, his revocation of probation for that offense, and his conviction for burglary committed with the intent to commit rape.

## II. *PENRY* EVIDENCE?

We must determine whether appellant presented evidence sufficient to raise a claim under *Penry v. Lynaugh*, supra.[5] Penry presented evidence of brain damage that occurred either at birth or as a result of beatings and multiple injuries to the brain at an early age, resulting in an "organic brain disorder at the time of the offense which made it impossible for him to appreciate the wrongfulness of his conduct or to conform his conduct to the law." *Penry*, 109 S.Ct. at 2941. The State's psychiatric experts acknowledged that Penry had "extremely limited mental ability, and

---

4. Dr. Modlin testified that a person must have a blood alcohol level of .20% or above to enter a state of alcoholic blackout.

5. At the punishment phase of his trial, appellant requested a special instruction on mitigating evidence, *including* a third special issue, ostensibly designed to allow the jury to vote against the

death penalty based on mitigating circumstances. For text of the requested instruction, see op. at 118. Although we express no opinion on the merits of appellant's requested instruction, we do find that it was adequate to "call the trial court's attention to error in the charge." TEX.CRIM.PROC.CODE art. 36.15.

that he seemed unable to learn from his mistakes." *Id.* at 2942.

■ In *Penry*, the Supreme Court concluded that, in the absence of instructions informing the jury that it could consider and give effect to Penry's mitigating background evidence, "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.* 109 S.Ct. at 2952. The evidence of Penry's mental problems and organic brain disorder, while relevant to special issues one and two of article 37.071, was also relevant to Penry's "moral culpability beyond the scope of the special [issues]." [6] *See Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) (O'Connor, J. concurring). Thus, even if the jury found that Penry's mitigating background evidence somehow reduced his "personal culpability" for the crime, the special issues of article 37.071 did not provide the jury with a vehicle for expressing a "reasoned moral response" that would allow a sentence less than death.

If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 [107 S.Ct. 837, 841, 93 L.Ed.2d 934] (1987) (concurring opinion). Moreover, *Eddings [v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982),] makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger*, 481 U.S. 393 [107 S.Ct. 1821, 95 L.Ed.2d 347] (1987). Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence. *Woodson [v. North Carolina]*, 428 U.S. [280] at 304, 305 [96 S.Ct. 2978 at 2991, 2992, 49 L.Ed.2d 944 (1976)]. "Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown, supra*, 479 U.S. at 545 [107 S.Ct. at 841] (concurring opinion) (emphasis in original).

*Penry*, 109 S.Ct. at 2947. Thus, under *Penry*, the jury must be allowed not only to consider relevant mitigating evidence of the defendant's background, character and circumstances of the offense, it must also be able to make a reasoned moral response to that evidence in arriving at an individualized assessment of the appropriate punishment.

### A. Mitigation and "Relevance"

Although the Supreme Court has made it clear that relevant mitigating evidence may not be excluded in the capital sentencing process, the parameters of exactly which evidence is both mitigating and "relevant" are less clear. For example, the plurality opinion in *Franklin* concludes that State legislatures may enact some "framework" for the use of relevant mitigating evidence

---

**6.** The Supreme Court found that Penry's limited mental capacity and his inability to learn from his mistakes apparently did not preclude an ability to act "deliberately as that term is commonly understood," under special issue one. Penry's background evidence was relevant beyond the scope of issue one, since the jury could "conclude that Penry was less morally 'culpable than defendants who have no such excuse[.]'" *Penry*, 109 S.Ct. at 2949.

With respect to his being a continuing threat to society under special issue two, such evidence pointed not only toward a finding of future dangerousness, but also to reduced culpability for the crime. The Court concluded that such "two edged sword" evidence directed the jury to make an affirmative finding of a continuing threat to society, usually resulting in a death sentence, based on evidence that tended to absolve the defendant of personal or moral culpability for his crime. In Penry's case his mental problems made it extremely likely that he would continue to be a danger. The Court found that Penry's "culpability" for his acts, however, could somehow be reduced by the origin of his mental problems. *Id.*

in the capital sentencing procedure, but does not answer the most important question posed: What mitigating evidence is relevant to that procedure?

> [T]he sentencing jury may not be precluded from considering any relevant mitigating evidence. This statement leaves unanswered the question: relevant to what? While *Lockett* [*v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1977)] answers this question at least in part—making it clear that a State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's "character," "record," or the "circumstances of the offense"—*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors. See *Booth v. Maryland*, [482 U.S. 496], 107 S.Ct. 2529 [96 L.Ed.2d 440] (1987). Given the awesome power that a sentencing jury must exercise in a capital case, it may be advisable for a State to provide the jury with some framework for discharging these responsibilities.

*Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 2330, 101 L.Ed.2d 155 (1988) (plurality opinion) (citations omitted).

Although the Supreme Court believes that the special issues of article 37.071 are relevant to "personal" or "moral" culpability, the Court in *Penry* makes it clear that not all possible aspects of "culpability" for a particular crime can be addressed by these two or three questions. Whether specific relevance, as defined in Rule 401, TEX.R.CRIM.EVID., to "personal" or "moral" culpability is required is even less clear.

In her concurring opinion in *Franklin*, Justice O'Connor, the author of *Penry*, provides a somewhat cryptic answer to the lingering question in the *Franklin* plurality opinion concerning relevance of mitigating evidence.

In my view, the principle underlying *Lockett, Eddings,* and *Hitchcock* is that punishment should be directly related to the personal culpability of the criminal defendant.

\* \* \* \* \* \*

> If ... petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict question, or that had relevance *to the defendant's moral culpability* beyond the scope of the special verdict questions, the jury instructions would have provided the jury with no vehicle for expressing its "reasoned moral response" to that evidence. (emphasis added)

*Franklin*, 108 S.Ct. at 2333. Thus, in Justice O'Connor's view, a separate instruction on mitigation is required when the mitigating evidence presented is of relevance to "moral culpability," and that evidence cannot be given mitigating effect within the scope of the special issues.

### B. Moral Culpability—or an Individualized Assessment?

We first note that the Supreme Court has not defined "personal" or "moral culpability." We believe that the terms "personal" and "moral culpability," used by the Court in *Penry*, might lead to the conclusion that a capital defendant's guilt is somehow diminished by the introduction of certain forms of mitigating evidence.[7]

We think a more appropriate analysis would be to focus the punishment phase of the trial on an individualized assessment of the capital defendant for "deathworthiness." Above all, the capital defendant must be afforded a "particularized consideration of relevant aspects of [his] character and record ... before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).

---

**7.** Under a bifurcated system, culpability for the crime is an issue that should normally be resolved at the guilt/innocence phase of the trial. One might surmise in a hypothetical case, that a defendant who was the product of a broken home, parental abuse, and an unhappy marriage, was only 70 percent "morally culpable" for the crime he committed—the other 30 percent being attributable to his unfortunate background.

A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.

\* \* \* \* \* \*

This Court has previously recognized that "[f]or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55 [58 S.Ct. 59, 61, 82 L.Ed. 43] (1937).

\* \* \* \* \* \*

[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment, see *Trop v. Dulles,* 356 U.S. [86], at 100 [78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1957)] (plurality opinion), requires consideration of the character and record of the individual offender and the circumstances of the offense as a constitutionally indispensable part of the process of inflicting the penalty of death.

This conclusion rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long.... Because of that qualitative difference there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 304–305, 96 S.Ct. at 2991–2992.

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), decided the same day as *Woodson,* the Supreme Court upheld the Texas capital murder system. The constitutionality of the Texas procedure turned on whether the special issues allowed "consideration of particularized

mitigating factors." *Id.* at 272, 96 S.Ct. at 2956.

By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function.

*Id.* at 276, 96 S.Ct. at 2958.

The Supreme Court in *Jurek* required a broad reading of article 37.071 to allow any mitigating circumstances relevant to the individual capital offender. The Court, in fact, enumerated several mitigating factors potentially relevant under a broad conception of article 37.071. *Id.* at 272–73, 96 S.Ct. at 2956–57. *Penry,* however, destroyed the illusion that the special issues mandated by article 37.071 can handle all capital offenders and offenses. While the Court in *Penry* focused on the "moral culpability" of a brain damaged, sociopathic, and mentally retarded offender, the true problem, as we read *Penry,* with the Texas system as applied in that case, was the inability of the procedure to allow an individualized assessment of the appropriateness of the death penalty, given the offense and the offender.

We believe that the concept of "moral culpability" (or in our view deathworthiness), as used by the Supreme Court in *Penry* and other Eighth Amendment cases is relevant to the sentencing process as it provides additional insight into an overall assessment of the offender. For example, the insight obtained from evidence of certain positive character traits merits consideration for reasons unrelated to the concerns of the special issues.[8] Positive character traits, such as artistic talent or service to others, while arguably relevant to special issue two, would more likely serve as a basis for a sentence less than death for reasons beyond the scope of the special issues. Positive character traits are, how-

---

8. "Evidence of voluntary service, kindness to others, or of religious devotion might demonstrate positive character traits that might miti-

gate against the death penalty." *Franklin v. Lynaugh,* 108 S.Ct. at 2333.

ever, clearly relevant to our conception of an individualized assessment of deathworthiness. Thus, deathworthiness, as raised by relevant mitigating evidence, is an appropriate, but not exclusive factor, to be used in evaluating the punishment alternatives for the individual capital offender.

### C. An Individualized Assessment Under Special Issue Two

Appellant offered evidence of his background and character to support his theory that he was not a continuing threat to society, and therefore direct the jury towards a negative finding to the second special issue. At trial, appellant called Dr. Modlin, who testified that his examination of appellant's psychiatric history led to his opinion that appellant's brutal murder of Kumpf was incompatible with his life history. Modlin further testified that at the time of the offense appellant's overall situation was about the best it had ever been. Appellant had been steadily employed, had a good social and sexual relationship with his girlfriend, had a good relationship with his mother, and had other social contacts. His violence in murdering Kumpf was largely inexplicable. In summation, appellant used Modlin's testimony, plus his psychiatric, educational, and overall life history, to argue against an affirmative finding that he would pose a continuing threat to society under special issue two. As presented and argued at trial, appellant's evidence was not comparable to the "two edged sword" evidence of organic brain damage and mental retardation found in *Penry. See* note 6.

■ The Eighth Amendment requires a broad reading of special issue two of article 37.071, to include any "mitigating circumstances relating to the individual defendant." *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958. We find that evidence of appellant's

limited intellectual and mental capability, his problematic relationship with his father, physical abuse by his father, and his age at the time of the offense is relevant to a proper resolution of the concerns of special issue two.

Appellant offered and argued his mitigating evidence to show that he would not be a continuing threat to society. Thus, such evidence could have been used by the jury to answer special issue two negatively, even absent the *Jurek* requirement of broad admissibility.

■ We agree that appellant was entitled to a vehicle for consideration and effectuation of his mitigating evidence. In the instant case, however, we find that special issue two provided the jury with an appropriate vehicle for evaluating and acting upon appellant's mitigating evidence.

### D. Mitigation Beyond the Scope of Article 37.071 and an Individualized Assessment

■ Although appellant's background and character evidence is relevant to the concerns of special issue two, we conclude that the mitigating evidence in the instant case is otherwise irrelevant to an individualized assessment of the deathworthiness of appellant. Appellant's background evidence does not tend to excuse or explain his criminal act, as did the evidence presented by Penry. Appellant did not present any evidence of mitigating positive character traits. Furthermore, there is little or no connection between his background and character evidence and the facts and circumstances of his criminal acts in the instant case. Appellant's expert, Dr. Modlin, testified that appellant's record could not explain the brutal crime appellant committed.[9] Appellant made no showing

---

9. The dissent focuses on the fact that appellant's "only remaining viable argument was to persuade the jury to consider and give effect to the evidence through the second special issue," [implying that since appellant's requested instruction was refused, appellant's only avenue was to "funnel" his mitigating evidence through special issue #2]. Op. at 141, Baird, J., dissenting.

Conceding this point for the sake of argument, does this mean that if appellant's special

instruction had been given, Dr. Modlin would have testified that, on further reflection, appellant really *was* a future danger to society, that the crime really *was* entirely predictable, given appellant's background and mental history, but that he should be extended mercy because of these misfortunes.

that the mitigating evidence of his character, background and mental status somehow specifically reduced his blameworthiness for the murder of Kumpf in a way that could not be adequately addressed through the special issues.

If the mitigating evidence of appellant's background, character, or circumstances of the offense can be given effect under article 37.071, then the defendant is not entitled to an additional special instruction on that mitigating evidence. A jury instruction on mitigating evidence about background, character or circumstances of the offense may not be required unless the mitigating evidence is "not relevant to the special verdict questions, or ... [has] *relevance to the defendant's ["]moral culpability["]* beyond the scope of the special verdict questions." *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) (O'Connor concurring) (emphasis added).[10]

> If we accept Dr. Modlin's testimony at face value, even conceding the strategy limitation placed on appellant, he opined, in effect, that appellant's commission of the crime was *not* "attributable to a disadvantaged background, or to emotional and mental problems," *Penry v. Lynaugh,* 492 U.S. at 319, 109 S.Ct. at 2947, but was, by all accounts, aberrational. Therefore, the jury in this case was able to "make an individualized assessment of the appropriateness of the death penalty" pursuant to special issue #2. *Id.*

**10.** Justice O'Connor seems to further require some nexus between the mitigating evidence and culpability for the crime. See *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (concurring opinion). If moral or personal culpability is reduced only when the criminal act (murder) is "attributable to a disadvantaged background, or to emotional and mental problems," then mitigating evidence relevant to the defendant's character, background, mental condition, or circumstances of the offense must also be connected with or somehow help to explain or excuse the commission of the offense by this defendant. *See e.g., Gribble v. State,* 808 S.W.2d 65 (Tex.Cr.App. 1990) (Evidence of either actual or imagined sexual abuse of appellant at an early age by his mother tended to ameliorate fault for appellant's intermittent acts of violence against women. Appellant was thought of as stable, hard working and polite, but his sexual fantasies combined with drugs or alcohol developed into true psychosis resulting in violent behavior.)

We recognize, however, that a nexus requirement would seem to be in conflict with *Lockett*

## III. CONCLUSION

■ We find that article 37.071 did not violate appellant's Eighth Amendment right to an individualized assessment of the appropriateness of the death penalty. The jury could consider and give effect to his mitigating evidence on background and character within the scope of the special issues.[11] The jury, having returned "Yes" answers to the special issues, was not then entitled "to cast an 'independent' vote against the death penalty." *Franklin,* 108 S.Ct. at 2330. *Jurek* affirmed the constitutionality of the Texas special issue practice, and *Penry* did not overrule that holding. Thus, we are duly constrained to consider challenges to article 37.071 in light of these decisions. If we were to require a special issue on mitigation on the facts of the instant case, we do not believe that the special issues of article 37.071 would, in the future, continue to serve any useful pur-

> *v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) and *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
>
> [The] Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.
>
> * * * * * *
>
> [A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.
>
> *Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965; *see Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
>
> In *Eddings, supra,* the Court found that the sentencer may not be precluded, as a matter of law, from considering relevant mitigating evidence.

**11.** The Supreme Court has found that the Texas special issue practice under article 37.071 is still viable, and the second special issue can still be used by the jury for consideration of mitigating evidence. "In resolving the second Texas Special Issue the jury [is] surely free to weigh and evaluate [evidence of character] as measured by his likely future behavior." *Franklin,* 108 S.Ct. at 2329.

pose in arriving at an individualized assessment of the appropriateness of the death penalty.

The only evidence proffered by appellant that could arguably be relevant to his "moral culpability" for the murder of Kumpf was the evidence of voluntary intoxication and the possibility of alcoholic blackout at the time of the offense. On rehearing, however, appellant does not argue that the evidence presented regarding his voluntary intoxication at the time of the offense and his claim of alcoholic blackout is relevant to his moral culpability beyond the scope of the special issues. Thus, we will not address whether such evidence presented a need for appellant's special requested instruction.

Appellant's motion for rehearing is overruled and the judgment of the trial court is affirmed.

CLINTON, Judge, dissenting.

In *Black v. State*, 816 S.W.2d 350 (Tex. Cr.App., delivered this day) (Campbell, J., concurring), a majority of judges today agree that error predicated upon *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), may be raised for the first time on direct appeal or collateral attack, at least so long as trial occurred prior to the date of that decision. This is so because before that date a *Penry* claim was a "right not recognized" in this Court. *Ex parte Chambers*, 688 S.W.2d 483 (Tex. Cr.App.1984) (Campbell, J., concurring). This Court's obduracy in the last dozen years in refusing to accept the necessary implications of *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), *Lockett v. Ohio*, 438 U.S. 586, at 604, 98 S.Ct. 2954, at 2965, 57 L.Ed.2d 973, at 990 (1978) (Plurality opinion), and their progeny, led directly to that conclusion. See *Stewart v. State*, 686

S.W.2d 118 (Tex.Cr.App.1984) (Clinton, J., dissenting). How ironic, then, that in the instant cause the Court continues to ignore the impact of those earlier cases in construing the reach of the substantive holding in *Penry v. Lynaugh*, supra.

The United States Supreme Court has told us beyond peradventure that "the Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to *decline to impose* the death sentence." *McCleskey v. Kemp*, 481 U.S. 279, at 304, 107 S.Ct. 1756, at 1773, 95 L.Ed.2d 262, at 286 (1987) (emphasis in the original). See also *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987). "[A]ny aspect of a defendant's character or record and any of the circumstances of the offense" that in reason could persuade a jury to impose a penalty less than death may be said in this context to be "relevant" mitigating evidence. *Lockett v. Ohio*, supra, 438 U.S. at 604, 98 S.Ct. at 2965, 57 L.Ed.2d at 990; *Eddings v. Oklahoma*, 455 U.S. 104, at 110, 102 S.Ct. 869, at 874, 71 L.Ed.2d 1, at 8 (1982).[1]

In *Lockett v. Ohio*, supra, a plurality of the Supreme Court invalidated the death sentence of a 21 year old defendant. Under the Ohio statute then governing capital sentencing, the trial judge was to impose a sentence of death unless he found one of three statutorily defined mitigating circumstances, *viz*: 1) that the deceased "induced or facilitated" the offense; 2) that the accused acted under "duress, coercion or strong provocation[;]" or 3) that the accused's conduct was a product of his "psychosis or mental deficiency[.]" *Id.*, 438 U.S. at 607, 98 S.Ct. at 2966, 57 L.Ed.2d at 991–92. Although such factors as Lockett's age and criminal record could be considered in the determination whether any

---

1. In truth, the concept of "relevancy" in this context seems odd to me. The only material issue, or "fact of consequence," is whether an accused found guilty of a capital crime deserves a sentence less than death. As is the case at the punishment phase of a non-capital prosecution, where the issue is simply "what punishment to assess," this is "a normative process, not intrinsically factbound." *Murphy v. State*, 777 S.W.2d

44, at 63 (Tex.Cr.App.1989) (Plurality opinion on State's motion for rehearing). That being the case, it seems to me that "what is 'relevant' to determining proper punishment is more a question of policy than of logic." *Id.*. Because it is a question of Eighth Amendment proportions, however, that policy call is ultimately for the United States Supreme Court to make.

of the statutory mitigating circumstances existed, they could not be regarded as justifications in their own right for a sentence less than death. Nor could factors such as the accused's relatively minor role in the events leading up to the murder, or absence of an intent to kill on her part. A plurality of the Supreme Court held that this limitation of the range of mitigating circumstances was incompatible with its recent Eighth Amendment jurisprudence, most notably *Woodson v. North Carolina,* supra. In a companion case to *Lockett, Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the same plurality overturned the death penalty of a defendant who had been sixteen years old, high on mescaline, and possibly only an accomplice at the time of his offense.

In *Eddings v. Oklahoma,* supra, a majority of the Supreme Court adopted the holding of *Lockett.* There, even though the trial judge had taken account of Eddings' youth as a mitigating factor *per se,* he had refused to consider within Oklahoma's open-ended mitigation statute the troubled circumstances of Eddings' upbringing. After recounting Eddings' "neglectful, sometimes even violent family background[,]" and his circumstantially retarded mental and emotional development, the Supreme Court went on to observe:

> "All this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must background and emotional development of a youthful defendant be duly considered in sentencing."

455 U.S. at 116, 102 S.Ct. at 877, 71 L.Ed.2d at 12. There is no suggestion in *Eddings* that a capital accused's crime must be directly attributable to the circumstances of his youth before those circumstances will have mitigating impact under the Eighth Amendment. On the strength of *Lockett,* the Supreme Court vacated Eddings' sentence of death.

In *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), although allowing such mitigating evidence as "the difficult circumstances of [Skipper's] upbringing[,]" the trial court refused to admit testimony regarding his good behavior and adjustment during incarceration pending his trial. The Supreme Court recognized that "any [favorable] inferences" deriving from this evidence "would not relate specifically to petitioner's culpability for the crime he committed[.]" Nevertheless, citing *Lockett,* supra, the Court opined that "there is no question but that such inferences would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death.'" 476 U.S. at 4–5, 106 S.Ct. at 1671, 90 L.Ed.2d at 7. Because this evidence was not considered, Skipper's death sentence was vacated. It is true that in *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), a majority of the Supreme Court concluded that, in the particular context of Article 37.071(b), V.A.C.C.P., special issues, the mitigating significance of good behavior in jail pending trial could be fully accommodated within the second special issue, regarding future dangerousness. The principle of *Skipper* remains intact, however, and applies beyond the context of good conduct in jail. Proffered evidence does not necessarily have to relate specifically to culpability for the charged crime to be "relevant" to serve as a valid basis for a sentence less than death. Accordingly, Justice O'Connor conceded in her concurring opinion in *Franklin* that "evidence of voluntary service, kindness to others, or of religious devotion" could well serve as relevant mitigating circumstances inasmuch as it "might demonstrate positive character traits that might mitigate against the death penalty." 487 U.S. at 186, 108 S.Ct. at 2333, 101 L.Ed.2d at 173.

Thus the stage was set for *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). There the Supreme Court decided that there was an Eighth Amendment violation under circumstances left open in *Franklin, viz:* where there is:

> "mitigating evidence about ... background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had rel-

evance to the defendant's moral culpability beyond the scope of the special verdict questions, [and] the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence."

492 U.S. at 322, 109 S.Ct. at 2948, 106 L.Ed.2d at 280, quoting *Franklin v. Lynaugh*, supra, which in turn quotes *California v. Brown*, supra. Penry presented evidence of his mental retardation and of some childhood abuse. The Supreme Court held that although such evidence may have mitigating relevance to the statutory special issues, the special issues were insufficient to accommodate its full mitigating relevance.

This holding cannot be limited to the particular facts presented in *Penry*. Whenever evidence is proffered which is "relevant" as mitigating evidence, but its mitigating significance is either quite apart from, or goes beyond, any bearing it has on one of the statutory special issues, the failure to provide the sentencer with some mechanism by which to account for that evidence, and, in its reasoned moral response, assess a sentence of less than death, will invalidate any sentence of death imposed. This principle applies equally to any evidence the Supreme Court has recognized as constitutionally mitigating that has significance apart from, or beyond, the special issues, whether or not the evidence relates specifically to the accused's culpability for the crime he committed. *Skipper v. South Carolina*, supra.

In the instant cause appellant presented evidence of a disadvantaged and abused childhood. He also established a limited intelligence which at least at one time tested on the borderline of mild retardation. This, of course, represents "classic" *Penry* evidence. The majority's attempt to downplay the mitigating impact of this evidence beyond the scope of special issues is unconvincing. It seems to boil down to the observation that "there is little or no connec-

tion between [appellant's] background and character evidence and the facts and circumstances of his criminal acts in the instant case." At 118. But as even the majority acknowledges, there is no "nexus" requirement to be derived from *Penry*, supra. And any such requirement the majority might wish to impose would be inconsistent with the holding in *Skipper v. South Carolina*, supra. At any rate, the jury would be free to conclude that appellant's mental and emotional problems had an adverse impact upon his impulse control in a way not relevant to special issues without necessarily hearing direct or expert testimony to that effect.

There is also evidence appellant was intoxicated at the time of the offense. See *Bell v. Ohio*, supra. It seems to me intolerably grudging that the majority refuses to even consider this mitigating fact because it is not specifically addressed in appellant's motion for rehearing.[2] It is true that intoxication will be a relevant consideration in answering the first special issue pertaining to deliberateness. But what the Supreme Court observed in *Penry* as to mental retardation has application as well in context of intoxication:

"Penry's mental retardation was relevant to the question whether he was capable of acting 'deliberately,' but it also 'had relevance to [his] moral culpability beyond the scope of the special verdict questio[n].' *Franklin*, 487 U.S., at 185, 101 L.Ed.2d 155, 108 S.Ct. 2320 [at 2332]. Personal culpability is not solely a function of a defendant's capacity to act 'deliberately.' A rational juror at the punishment phase of the trial could have concluded, in light of Penry's confession, that he deliberately killed Pamela Carpenter to escape detection. Because Penry was mentally retarded, however, and thus less able than a normal adult to control his impulses or to evaluate the consequences of his conduct, ... the same juror could also conclude that Penry was less morally 'culpable than defen-

2. After today's decisions in *Black v. State*, supra, and in *Ex parte Goodman*, 816 S.W.2d 383 (Tex. Cr.App., delivered this day), appellant can still complain of the failure of the jury charge to

account for his voluntary intoxication for the first time by way of post-conviction application for writ of habeas corpus pursuant to Article 11.07, V.A.C.C.P. Why not address it now?

dants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood. *California v. Brown*, 479 U.S., at 545, 93 L.Ed.2d 934, 107 S.Ct. 837 [, at 841] (concurring opinion)."

492 U.S. at 322–23, 109 S.Ct. at 2949, 106 L.Ed.2d at 280–81. Similarly, all "deliberateness" aside, jurors might rationally believe that the impairment of judgment and impulse control that accompanies intoxication might render an intoxicated defendant less deserving of a sentence of death than a sober man would have been. A jury that has sworn to answer special issues strictly in accordance with the facts, however, has no mechanism for considering intoxication in mitigation, other than to answer the deliberateness question "no." A juror might believe that in spite of his intoxication, a capital accused acted deliberately. The same juror might also believe that the accused was nevertheless less morally culpable than would have been a sober man committing the same offense. That juror would have no way of effectuating this last belief under the instruction given. See *Penry v. Lynaugh*, supra, 492 U.S. 302, at 323–24, 109 S.Ct. 2934, at 2949, 106 L.Ed.2d 256, at 280–81 (1989).

The majority complains that:

"If we were to require a special issue on mitigation on the facts of the instant case, we do not believe that the special issues of article 37.071 would, in the future, continue to serve any useful purpose in arriving at an individualized assessment of the appropriateness of the death penalty."

At 401. Of course Article 37.071(b) continues to serve a legitimate, if constitutionally superfluous, function of narrowing the class of death-eligible defendants beyond the narrowing that already occurs under V.T.C.A. Penal Code, § 19.03. See *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). But if *Penry* stands for anything, it is that Article 37.071, by itself, is a constitutionally unreliable mechanism for determining that death is an appropriate penalty whenever evidence is proffered having *mitigating* potential that

transcends its logical relevance to the special issues. That in its current form the statute fails to function adequately as a conduit for much of what the Supreme Court has identified as mitigating evidence, thus rendering it unconstitutional in application in many cases under *Lockett* and its progeny, including *Penry*, necessarily means it has only a limited utility. There is no escaping that.

The majority today discounts the mitigating relevance of appellant's evidence in order to salvage something of Article 37.071, supra. But when the Supreme Court has defined evidence as "relevant" for Eighth Amendment purposes, this Court is not at liberty to regard it otherwise, even to resuscitate a statute. Because the majority embraces such a crabbed interpretation of *Penry*, in derogation of its precursors, *Woodson*, *Lockett* and *Skipper*, all supra, I respectfully dissent.

MALONEY, J., joins.

BAIRD, Judge, dissenting.

I respectfully dissent to the result reached by a majority of this honorable Court. The central issue presented in this cause is whether the Texas capital sentencing scheme, Tex.Code Crim.Proc.Ann. art. 37.071, operated in a manner consistent with the protections guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution. The majority concludes:

"appellant was entitled to a vehicle for consideration and effectuation of his mitigating evidence. In the instant case, however, we find that special issue two provided the jury with an appropriate vehicle for evaluating and acting upon appellant's mitigating evidence."

*Lackey*, op. on rehearing at 115.

I believe appellant's mitigating evidence of disadvantaged background and mental and emotional problems fell beyond the scope of the special issues. Therefore, art. 37.071 operated in an unconstitutional manner as applied to appellant by not providing the jury with a vehicle to express its reasoned moral response to appellant's mitigating evidence that might serve as a basis

for a sentence less than death. See also, *Boggess v. State* (Tex.Cr.App. No. 69,990, delivered this date) (Baird, J., dissenting); *Ex parte Baldree*, 810 S.W.2d 213 (Tex.Cr. App. delivered this date) (Baird, J., dissenting).

The reason for my belief stems from a careful reading of *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Justice O'Connor's concurring opinion in *Franklin*, states:

> Under the sentencing procedure followed in this case the jury could express its views about the appropriate punishment only by answering the special verdict questions regarding the deliberateness of the murder and the defendant's future dangerousness.[1] To the extent that the mitigating evidence introduced by petitioner was relevant to one of the special verdict questions, the jury was free to give effect to that evidence by returning a negative answer to that question. If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions, the jury instructions would have provided the jury with *no* vehicle for expressing its "reasoned moral response" to that evidence. If this were such a case, then we would have to decide whether the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation.

*Id.,* 487 U.S. at 185, 108 S.Ct. at 2333 (O'Connor, J., joined by Blackmun, J., concurring).

The only mitigating evidence Franklin presented was a stipulation that his disciplinary record, while incarcerated from 1971–1974 and 1976–1980, was without incident. *Id.,* 487 U.S. at 168, 108 S.Ct. at 2324. According to the plurality and concurring opinions in *Franklin*, the jury was free to

give mitigating effect to Franklin's evidence in answering the second special issue. Specifically, Justice O'Connor stated:

> ... While it is true that the jury was prevented from giving mitigating effect to the stipulation to the extent that it demonstrated positive character traits other than the ability to exist in prison without endangering jailers or fellow inmates, that limitation had no practical or constitutional significance in my view because the stipulation had no relevance to any other aspect of petitioner's character.

*Id.,* 487 U.S. at 185, 108 S.Ct. at 2333.

Today, the majority concludes that appellant's mitigating evidence consisting of "limited intellectual capacity, his problematic relationship with his father, [and] physical abuse by his father", to the extent that it is relevant to appellant's moral culpability, could be given full mitigating effect through the second special issue. *Lackey*, op. on rehearing at 118. In other words, the majority believes that evidence of appellant's disadvantaged background and mental problems have "no practical or constitutional significance" beyond the second special issue. I disagree.

In *Penry*, 492 U.S. 302, 109 S.Ct. 2934, Justice O'Connor, speaking for a majority of the Court, stated:

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." [Citation omitted.] Moreover, *Eddings* makes it clear that it is not enough simply to allow the defendant

---

1. Only special issues one and two were submitted at the punishment phase of appellant's trial.

to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. [Citation omitted.] Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human being" and has made a reliable determination that death is the appropriate sentence. [Citation omitted.] "Thus, the sentence imposed should reflect a reasoned moral response to the defendant's background, character, and crime." [Citation omitted.]

*Id.,* 492 U.S. at 319, 109 S.Ct. at 2947.

My reading of *Franklin* and *Penry* is as follows: If the mitigating evidence has a practical and constitutional significance to a criminal defendant's moral culpability, the court should provide the jury with a vehicle to give effect to that evidence. Appellant's mitigating evidence has such practical and constitutional significance and art. 37.071 failed to provide appellant's jury with a vehicle to express its reasoned moral response to that evidence. In fact, *Penry* specifically discussed how the special issues were insufficient vehicles for a jury to give mitigating effect to evidence demonstrating disadvantaged background and mental problems.[2] *Penry,* 109 S.Ct. at 2949.

Under the facts of this particular case, the jury might have thought that appellant was not "deathworthy" because of his disadvantaged background, and mental and emotional problems, but had no vehicle to express that reasoned moral response. In the absence of an appropriate instruction, a reasonable juror could well have believed that there was not a vehicle for expressing the view that appellant did not deserve to be sentenced to death based upon his mitigating evidence. *Id.,* 492 U.S. at 326, 109 S.Ct. at 2950.

Finally, I believe the majority places unwarranted emphasis on defense counsel's closing argument. The majority notes:

"In summation, appellant used Modlin's testimony, plus his psychiatric, educational, and overall life history, to argue against an affirmative finding that he would pose a continuing threat to society under special issue two. As presented at trial, appellant's evidence was not comparable to the "two edged sword" evidence of organic brain damage and mental retardation found in *Penry.* [Citation omitted.]"

*Lackey,* op. on rehearing at 131.

Appellant made his summation *after* the trial court had refused appellant's requested mitigating instruction and the punishment charge had been read to the jury. Since the jury did not have an independent vehicle to give effect to appellant's mitigating evidence, appellant's only remaining viable argument was to persuade the jury to consider and give effect to the evidence through the second special issue.[3] Surely, we cannot now utilize the argument made by appellant's trial counsel as a means for excusing a violation of the Eighth and Fourteenth Amendments.

For the foregoing reasons, I believe appellant was entitled to have his jury provided with a vehicle to express its reasoned moral response to the mitigating evidence demonstrating a disadvantaged background, and mental and emotional problems. Because art. 37.071 did not provide such a vehicle, the Texas capital sentencing scheme operated in an unconstitutional manner as applied to appellant. With these comments I respectfully lodge this dissent.

---

**2.** Penry suffered from organic brain damage and was mentally retarded. Penry's brain damage was probably caused at birth, but may have been caused by beatings and multiple injuries to the brain at an early age. Penry was frequently beaten over the head with a belt when he was a child.

**3.** During deliberations, the jury foreperson sent the following note to the court:

Certain members of the Jury have ask (sic) to have the word *Society* defined as contained in Special Issue No. 2.

More specifically, should we consider the fact that prison life is relivent (sic) in regards to our consideration as to "... a continuing threat to society?", as you have defined above.